## Monroe County Savings Bank & Trust Company, Appellee, v. Louis Klohr, Appellant.

Opinion filed July 16, 1928.

P. K. JOHNSON, for appellant.

POPE & DRIEMEYER, for appellee.

MR. JUSTICE NEWHALL delivered the opinion of the court.

Appellee filed a creditor's bill against appellant and others, and a decree was rendered in favor of appellee and appellant brings this appeal.

The bill avers that appellee on July 8, 1926, recovered a judgment in the circuit court of St. Clair county, against Caroline Klohr, mother of appellant, for $1,012.22 and costs and on the same date recovered another judgment against said Caroline Klohr and appellant for $1,808.95 and costs; that transcripts of the judgments were filed in Monroe county and executions issued which were returned "unsatisfied" by the sheriff.

The bill further avers that George Klohr died intestate on January 3, 1915, owning 385 acres of land in Monroe county, and leaving surviving him, Caroline Klohr, his widow, appellant, his son, and 11 other children; that the widow thereby became entitled to dower in said land and each child became the owner in fee of an undivided one-twelfth interest subject to said dower which had never been assigned; that Michael Klohr, one of said children, on September 22, 1925, conveyed to appellant, by quitclaim deed, all his interest in said real estate; that Caroline Klohr on the same day also conveyed by quitclaim deed all her interest in said land, except her homestead right, to appellant; that such conveyances were made to hinder and delay complainant in the collection of said judgment; that no consideration passed between the parties and were fraudulent and made for the purpose of cheating their creditors; that Caroline Klohr refused to apply for her assignment of dower in order to defeat complainant in the collection of said judgment.

Appellant and Caroline Klohr filed answers denying that such conveyances were made without consideration or for the purpose of defrauding creditors and alleged that the same were made in good faith and

for adequate consideration. Replications were filed and, after hearing before the court, a decree was entered finding all the material allegations of the bill to be true, and decreeing that such conveyances be set aside and declared null and void as to the complainant; that the sheriff be directed to sell the one-twelfth interest of Michael Klohr to satisfy the said judgment; that Caroline Klohr be decreed to be endowed of a one-third portion of said land and entitled to have her dower assigned and allotted to her and that the rents and profits be applied by a receiver, to be appointed by the court, to take charge of the land assigned to her as dower; that if the lands cannot be divided that the receiver be authorized to collect the widow's share of the rents to be applied on said judgment or that appellee at its option may have a jury impaneled to assess the yearly value of the dower and have the same applied upon said judgment until paid, and by the decree commissioners were appointed to assign dower.

The widow and all children were made parties defendant, who prayed a joint and several appeal, and appellant prosecutes this appeal.

Appellant contends that the evidence does not support the findings of the decree, and that the trial court had no jurisdiction to enter a decree for assignment of dower and to appoint a receiver to manage the same and collect the rents and profits arising therefrom.

At the time of the death of George Klohr, father of appellant, in 1915, he was living upon the farm in question, with his wife and 10 of his children. There was a mortgage of $9,000 on the farm. The adult children participated in the operation of the farm and after the death of the father the widow and children continued to live upon and manage the farm. They lived as a common family so far as the operation of the farm was concerned and there never was any division of the land or assignment of dower or homestead.

The widow was appointed administratrix and settled her husband's personal estate. The moneys arising from the operation of the farm were used to pay the living expenses of the family, to discharge the mortgage, to improve the buildings, pay taxes and the personal investments and expenses of various members of the household. No actual division of the moneys realized was ever made, no member of the family kept any bank account and the common fund was kept in currency between the leaves of a county atlas in the kitchen cupboard in the farm house, to which repository all adult members of the family had access and from time to time helped themselves as occasion demanded.

No books of account were produced and no written record was made by any of the interested parties of the additions or withdrawals that were made from the common fund or any notes or other memoranda were ever exchanged between the parties purporting to show what each had contributed or withdrawn from the common fund or from each other. The farm consisted of 385 acres, worth about $75 per acre, and a one-twelfth share subject to the dower was valued at about $3,200.

Appellee called the widow, Caroline Klohr, to testify in its behalf and stated that appellant did not pay her any cash at the time she made her conveyance to him; that appellant had worked on the farm, received from the common fund money that he needed from time to time but had never been paid for working; that the adult children were to receive half of the wheat crop and she the other half, but that all of the wheat money was put into the common fund and used to pay the mortgage debt and other expenses for running the farm; that at the time of making the deed she owed money to her sons Louis, Fred and Henry, but that she made the deed to Louis because he was the oldest son and she thought Louis should have the money before it might be lost; that she thought the boys came

first and wanted them paid before the bank (appellee); that appellant knew she owed the bank; that she had never made any note to Louis for her alleged debt to him or ever paid any interest to him; that what money Louis earned outside work was put into the common fund and used in the same manner as that received from the profits of the farm; that it was sort of understood by all of the children that at some time they were to get back what they contributed to the common fund, but her testimony as to what was contributed or owing was vague and uncertain; that at one time some of the adult boys worked for her at $150 per year, but it was uncertain when this alleged arrangement commenced or ceased, or when it was made an actual matter of debit and credit or who were the actual debtors or creditors; that no records were kept of payments made or received by appellant and the witness.

Appellee also called as its witness Michael Klohr, who testified that appellant knew he was indebted to the bank when he made the conveyance; that he received $125 when the deed was made and that later it was agreed he would receive $1,200 against the debt he had at home; that he was not indebted to appellant when the deed was made and did not know who was to pay him the $1,200; that he needed money and this was the only chance he had to get it; that prior to making the deed he had received at different times about $2,000 from the common fund at his mother's home; that he said he would pay it back when he got it, and there was no agreement about interest or any note made to evidence these alleged loans; that when he made the deed appellant said it would discharge his credit at home and that he would see that the witness receive the $1,200 from home, which was subsequently paid to him by various members of the family from the common fund; that the common fund owed money to appellant but he did not know the amount but he always thought that it was his mother who owed the

money; that while he was away from the farm for about three years he never asked for rent on account of his interest and never demanded any accounting.

Appellant testified, in his own behalf, that he worked on the farm with the other adult children, except when in the Army in 1919; that he also worked at times away from the farm at threshing and other jobs; that the money he received he brought home and placed in the common fund; that it was understood he was to draw wages from the common fund at the rate of $150 per year, and he claimed that there was owing him out of the common fund $5,474 when the deeds were made; that he drew money from the fund to make outside investments, and that this debt owing from the common fund was charged against his mother and brother Michael when the deeds were made.

On cross-examination he said this $5,474 was for wages and that he had it coming from his mother; that he and his brothers worked for her and the wages were for one-half of the wheat crop; that the money was put into the common fund with the understanding that the debts were to be paid first and that settlement was to be made after the debts were paid by the mother who was running the farm; that the mortgage debt on the farm was charged to his mother and that she paid it out of the common fund and in making settlement all of this mortgage debt was charged to her.

Herman and Henry Klohr, brothers of appellant testified for the defense to substantially the same arrangement as to the operation of the farm and the accumulation and disposition of the common fund; that in various outside investments made by members of the family there had been a loss of about $10,000; that some sort of a book was kept at home in which entries were made, but no books, accounts or memoranda of transactions between members of the family were produced, which showed the state of their ac-

count or what was in fact distributed from the common fund or owing by any contributor thereto.

In *Bartel v. Zimmerman,* 293 Ill. 154, it was held (page 162):

"It is the established rule of law in this State that a debtor may prefer a creditor or creditors and that such preference is valid notwithstanding the claims of other creditors, provided the debt preferred is actual and the property transferred does not greatly exceed the amount of the claim and that the transaction is not a mere device to secure an advantage to the debtor or to hinder, delay or defraud other creditors. This rule applies to members of a family, but where an immediate member of a family is preferred as a creditor there must be clear and satisfactory proof of a valid and subsisting debt which would be enforced and payment exacted regardless of the fortune or misfortune of the debtor. (*Schuberth v. Schillo,* 177 Ill. 346; *Dillman v. Nadelhoffer,* 162 id. 625.) While a conveyance between parties related to each other by blood or marriage does not, of itself, establish fraud in the transfer, the fact of relationship may properly be considered in connection with other evidence tending to impeach the transaction. (*Schroeder v. Walsh,* 120 Ill. 403.) Intent to defraud is sometimes implied from the relationship of the parties in connection with other circumstances. (20 Cyc. 487.)"

The facts upon which the rights of the parties depend must be determined in this case from the conduct of the parties and all of the circumstances in evidence including the family relations that existed.

An examination of the record shows that there was no clear and satisfactory proof of a valid subsisting debt which was to be enforced and payment exacted regardless of the fortune or misfortune of the widow and son. It is very evident from a reading of the testimony that in all probability, if the widow and son had not become involved financially to outside cred-

itors, their prior manner of conduct of the farm and peculiar method of handling the so-called "common fund" would have continued indefinitely. This method was not a debtor and creditor basis, and the withdrawals from the fund by members of the family, for their own use, was evidently to be returned at their option, depending rather upon their fidelity to the family and the success or failure of the particular purpose for which the money might be used. No books of account were kept wherein were entered any charges or credits, no notes were ever executed by any of the family to each other, or any interest charged or paid, in fact the entire arrangement lacked those elements which indicated that the family affairs were ever conducted between themselves on a debtor and creditor arrangement.

What was actually paid into the common fund over the period of years that the farm was operated, and by whom and where it went to, is vague and uncertain except that it is shown that from the earnings the mortgage debt was discharged, the farm improved and each member of the family received various sums not only for their personal living expenses but for outside investments, made apparently by common consent without any particular definite arrangement as to repayment.

Appellant contends that because appellee called as witnesses the defendant widow and son their credibility cannot be disproved and appellee is bound by their testimony. While it is true that where a party calls his adversary as a witness, he cannot question his credibility, yet if, when the entire testimony is considered, it is apparent that there was an intent to defraud and that the conveyance was made for the purpose of hindering and delaying creditors the testimony of the parties to the transaction that there was no fraudulent intent and that the conveyances were made in good faith will not be sufficient to prevent the

court from reaching a contrary conclusion based upon the whole record.

Appellant knew that his grantors were indebted to the bank at the time the conveyances were made and that the effect thereof was to place beyond the reach of ordinary process the collection of the bank's claims. From a careful consideration of all the testimony we are of the opinion that the purpose of the conveyances by Caroline Klohr and Michael Klohr was to place their property beyond the reach of their creditors, and that they were not supported by any valid subsisting debts and were not made in good faith.

As to the transaction between Caroline Klohr and appellee counsel contends that the main question is whether the court had the right to enter a decree for the assignment of her dower and for a receiver to manage and collect the same. Counsel concede that the rule in this State, as laid down in *Fletcher v. Shepherd,* 174 Ill. 262, is that the effect of the deed by the widow to appellee purporting to quitclaim all her interest in the farm, only had the legal effect of releasing her dower in the undivided one-twelfth interest of said farm. Caroline Klohr did not perfect her appeal from the decree of the trial court.

In *Petefish, Skiles & Co. v. Buck,* 56 Ill. App. 149, and *Thompson v. Marsh,* 61 Ill. App. 269, it was held that an unassigned, consummate right of dower may be reached by a creditor's bill and through the medium of a receiver the rents and profits sequestered for the benefit of judgment creditors. In 19 C. J. 537 it is said: "In many jurisdictions it is held that an unassigned right of dower may be reached by a judgment creditor in equity by means of a creditor's bill or other suitable remedy." In support of the text are cited cases from the courts of Massachusetts, New York, New Jersey, Ohio and the Federal courts.

Section 49 of the Chancery Act, Cahill's St. ch. 22, ¶ 49, authorizes a judgment creditor, by bill in chan-

cery, to compel a discovery of any property, money or thing in action due to the judgment debtor and subject it to the payment of his judgment. A thing in action is properly distinguished from a thing of which the owner has the actual or constructive possession but for which an action may be brought to reduce it to possession, and to constitute a thing in action there must be a fixed present right of the owner to recover the money or property in an action in his own name. *Tumy v. Mayer,* 289 Ill. 458.

Counsel for appellant cite the cases of *Jespersen v. Mech,* 213 Ill. 488, and *Press & Co. v. Fahy,* 313 Ill. 262, in support of their contention that the widow's unassigned dower rights cannot be sequestered for the benefit of judgment creditors but in our judgment they are not applicable to the instant case.

The *Jespersen* case involved the question of reaching the right to a widow's award prior to her election to claim the same, and it was held that it could not be reached until after the allowance. The *Press* case involved the power of a court of chancery to compel a corporation to issue a certificate of membership to an applicant who had not complied with the by-laws of the corporation, and the case does not support appellant's contention.

For the reasons aforesaid we are of the opinion that the decree of the trial court is supported by the law and the weight of the evidence, and accordingly the same is affirmed.

*Affirmed.*